*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

RONALD ALVIN SORING,

        Defendant-Appellant.

UNPUBLISHED
December 10, 2020

No. 348870
St. Clair Circuit Court
LC No. 18-002689-FH

Before: SWARTZLE, P.J., and BECKERING and GLEICHER, JJ.

PER CURIAM.

Defendant, Ronald Alvin Soring, appeals as of right his jury trial convictions of domestic violence, third-offense, MCL 750.81(4), and bribing, intimidating, or interfering with a witness, MCL 750.122(7)(a). The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to consecutive sentences of 1 to 20 years' imprisonment for domestic violence and 1 to 15 years' imprisonment for bribing, intimidating, or interfering, with a witness. Defendant argues on appeal that the prosecutor deprived him of his right to a fair trial due to her improper remarks during closing argument, or in the alternative, that his trial counsel was ineffective for failing to object to those remarks. He also contends the trial court abused its discretion by making his sentences consecutive without explaining why. Defendant's first two arguments lack merit, but he is correct regarding the need for a remand so the trial court can fully articulate its reasons for ordering that defendant's sentences be consecutive. On remand, we also instruct the trial court to correct what appears to be a clerical error in the judgment of sentence.

## I. FACTUAL BACKGROUND

The prosecutor admitted evidence at trial to establish that defendant and the victim were in a domestic relationship and they shared a home with the victim's son as well as a roommate, Les

Deal.[1]  Between October 1, 2018 and October 4, 2018, defendant was acting violently, drinking heavily, and acting "emotionally abusive" toward the victim.  On the evening of October 4, 2018, defendant left the house to go shopping with Deal.  While defendant was gone, the victim called her mother, who testified that the victim sounded upset and "very scared."  Concerned, the victim's mother called the Clay Township Police Department to conduct a welfare check on defendant and the victim.  When defendant and Deal returned to the home, defendant was acting "totally belligerent" and "out of sorts."  Defendant and the victim began arguing and continued to argue when Clay Township Police Officers James Pelletier and Clifford VanDerLinden arrived.  Defendant yelled at the officers to go away and yelled at the victim to close the front door on the officers.  The victim did not close the front door, so defendant got up to do it himself.  Officer Pelletier testified that as defendant went to close the front door, he took a "huge haymaker" swing at the back of the victim's head with his closed fist, and then stumbled toward her.  The officer yelled "don't hit her," and he and his partner entered the home.  The officers removed defendant from the home and, shortly thereafter, arrested him.

After being arraigned, defendant was ordered not to contact the victim.  Nevertheless, while he was in jail between October 4, 2018 and December 7, 2018, he called the victim 123 times.  The victim answered 35 of those phone calls.  During two calls on October 11, 2018, the victim and defendant discussed the charges against him, what the victim should and should not testify to, how she should phrase her testimony, and details of the October 4, 2018 incident.  Significant portions of these calls were played for the jury.  The victim posted bond for defendant on December 7, 2018, and defendant returned to his home with her.[2]  Prior to trial, the victim told her mother not to appear at trial and defendant told another prosecution witness, his estranged wife, that she did not need to appear at trial.

At trial, the jury found defendant guilty of domestic violence and of bribing, intimidating, or interfering with a witness.  The court sentenced defendant as previously indicated, and this appeal followed.

## II.  PROSECUTORIAL MISCONDUCT

Defendant argues he was denied a fair trial because the prosecutor committed misconduct by addressing facts and opinions during closing argument that were not supported by the evidence, and by appealing to the jury to sympathize with the victim.  We find no reversible error.

Because defendant did not preserve his arguments regarding any of the alleged misconduct he now points to by timely and specifically objecting and requesting a curative instruction at trial, our review is for plain error.  See *People v Mullins*, 322 Mich App 151, 172; 911 NW2d 201 (2017).  Under a plain-error review, defendant bears the burden of demonstrating that an error occurred, it was clear or obvious, and it affected his substantial rights.  *People v Carines*, 460 Mich

---

[1] The victim identified their roommate's last name as "Deal."  The name also appears in the record as "Diehl."  The victim testified that Deal passed away in October 2018.

[2] As of the filing of defendant's brief on appeal, defendant and the victim were still in a domestic relationship.

750, 763; 597 NW2d 130 (1999). "The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceeding." *Id*. Even if all three requirements are met, reversal is only warranted when the plain error resulted in an innocent defendant's conviction, or "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *People v Moorer*, 262 Mich App 64, 66-67; 683 NW2d 736 (2004).

"[T]he test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "Issues of prosecutorial misconduct are decided case by case, and this Court must examine the entire record and evaluate a prosecutor's remarks in context." *Id*. at 64. This is because "[t]he propriety of a prosecutor's remarks depends on all of the facts of the case." *Id*. (quotation marks and citations omitted). Prosecutors are afforded great latitude regarding their arguments. *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). In making those arguments, "[a] prosecutor may not make a factual statement to the jury that is not supported by the evidence, but he or she is free to argue the evidence and all reasonable inferences arising from the evidence as they relate to his or her theory of the case." *Dobek*, 274 Mich App at 66. (quotation marks and citations omitted). Additionally, the prosecutor need not argue in the blandest terms possible. *Id*.

With these principles in mind, we address each of defendant's arguments in turn. Defendant first contends that certain of the prosecutor's statements were not supported by, or were contrary to, the evidence presented. Specifically, defendant challenges the prosecutor's statement, "You've heard about those cycles of violence, the patterns that consist of control, controlling behaviors, irrational behaviors. When the defendant drinks that he'll either pass out or become violent. There is no in between [sic]." Defendant claims the prosecutor was attempting to portray the victim as a "battered woman," and that such condition requires expert testimony. Given the absence of expert testimony, defendant claims the statements were unsupported by the evidence.

Review of the prosecutor's statement in context does not lead us to conclude that it was made in an attempt to portray the victim as suffering from battered woman syndrome. Testimony from a qualified expert can, when relevant, help a jury evaluate a complainant's credibility. See *People v Christel*, 449 Mich 578, 579-80; 537 NW2d 194 (1995). But here, the context for the prosecutor's statement was her characterization of defendant as a "master manipulator" and her attempt to describe the nature of his relationships with numerous people, not just the victim. In addition, there was plenty of lay witness testimony presented at trial regarding defendant's "cycles of violence," patterns of control, controlling behaviors, and irrational behavior, and about his associated drinking habits.

Officer Pelletier testified that between 2014 and 2018, police were called to defendant's and the victim's home five to seven times due to domestic disputes, and defendant was drunk on each occasion. Officer Pelletier explained that each situation was caused by defendant not getting his way.

The victim's son testified that defendant's violent behavior was "just the alcohol talking" and that, while defendant often threatened him and his mother, defendant was "a lot of hot air" and did not follow through with his threats. Yet, he also conceded that in July 2018, defendant assaulted him while drunk.

Similarly, the victim testified that defendant did not become violent when he drank and would simply curl up on the couch with the dog and fall asleep.[3] Nevertheless, she admitted that in July 2018, she obtained a personal protection order against defendant because he had been acting violently for months and was drinking alcohol "24/7." The victim also testified that between October 1, 2018 and October 4, 2018, defendant had been emotionally abusive. She explained that when defendant was sober, their relationship and home life was "stable and great," however, defendant had a drinking problem. When he would drink, defendant would yell and curse at her and threaten to kick her out of the house. The victim told defendant during their second telephone call on October 11, 2018, that he did not take her feelings into account, treated her and her son "like garbage," and had been drinking behind her back, despite her trying to encourage him to stay sober. The victim told defendant she was afraid of him when he was drinking, and defendant insisted she was not afraid of him, but was afraid of "the liquor."

The victim's daughter testified that when defendant lived with her and her mother, he would drink all of the time, and would get "[c]razy violent, verbally abusive, emotionally abusive, [and] physically abusive." When defendant drank, "[e]verything would escalate and get crazy," and defendant would become violent toward "[a]nyone who crossed his path." She explained that "defendant was always drinking and drinking way more than he should be and sometimes it would be violent. Sometimes he would just pass out." Similar to promises made to the victim, defendant's daughter testified that defendant would fight with her mother when he was drunk, and once he was sober, he would promise to quit drinking and participate in a rehabilitation program. However, defendant would always fall back into the same "abusive pattern." As did the victim, defendant's daughter testified that defendant would try to hide his drinking. She recounted that when defendant drank, "you say one wrong thing or not the answer that he wants to hear and then it's just violence from there on out."

Defendant's estranged wife described defendant as "Dr. Jekyll and Mr. Hyde" with regard to his behavior when he was sober versus when he would drink. Defendant would promise her, as he promised the victim, that he would get better and participate in a rehabilitation program, but he never did. Moreover, similar to the situation that occurred between the victim's son and defendant, defendant attempted to hit his daughter while he was drunk.

The victim's mother testified that defendant "always" called the victim names, would threaten her with physical harm, and had hit her before when she did not "please him."

In light of the supportive lay testimony and the admitted jailhouse telephone calls between defendant and the victim demonstrating defendant's behavior toward others, we conclude that the prosecutor's remarks regarding "cycles of violence," defendant's patterns of control, controlling behaviors, and irrational behavior, and about defendant's drinking habits were amply supported by the evidence.

---

[3] The victim's arraignment testimony differed from her trial testimony, and she had to be impeached several times at trial with her arraignment testimony regarding the severity of defendant's conduct.

Defendant next argues that the prosecutor committed misconduct by expecting the jurors to act as experts when she asked them at closing argument what defendant's behaviors might "do to a person's psyche?" The context for this statement was the prosecutor's attempt to suggest an explanation for why, after all that allegedly had transpired, the victim would pick up defendant from jail. The prosecutor observed that when the victim had applied for a PPO in July 2018, she reported that defendant once told her that if he ever went to jail, she had "better bail [him] out or run for the hills." In our view, the prosecutor's rhetorical question was to get the jurors to use their reason and common sense to make a connection between defendant's prior threats and the fact that the victim nevertheless picked him up from the jail. It was not for the purpose of asking the jurors to go beyond the evidence or to act as expert witnesses.

Defendant also contends the prosecutor improperly "serve[d] as the absent expert" when stating, "[w]e know that in domestic violence relationships the most dangerous time for a victim is the time when she makes the decision to leave." Defendant's argument has some merit. The statement occurred in the context of the prosecutor's narration that the victim called her mother on the night of the incident and told her mother she was scared and was going to leave defendant. The challenged statement followed, and the prosecutor continued by recounting the testimony the victim told Officer Pelletier that defendant's conduct was "escalating." In context, the prosecutor appeared to be attempting to impress upon the jury that the victim had reason to be scared because her plan to leave defendant placed her in imminent danger.

Prosecutors are allowed great latitude with respect to their arguments, *Bahoda*, 448 Mich at 282, and they are not required to argue in the blandest of terms, *Dobek*, 274 Mich App at 66. A prosecutor may "argue the evidence and all reasonable inferences arising from the evidence as they relate to his or her theory of the case," but they may not make a factual statement to the jury that is not supported by the evidence. *Id*. Here, given the absence of any evidence regarding the most dangerous time for a victim of domestic violence, it was improper for the prosecution to present as a known fact that the most dangerous time is when the abused person decides to leave the abuser. In addition, the prosecutor's argument, as well as the record evidence, suggests that if matters were escalating, it was because defendant had been drinking, not necessarily because the victim had broached the idea that she and her son should pack up and leave. Although the prosecutor's statement was superfluous and did not reflect the testimony about defendant's conduct when under the influence of alcohol, we cannot say it affected the outcome in light of the properly admitted evidence.

Defendant next argues the evidence did not support the prosecutor's statement that there are no-contact orders in place for domestic violence cases because "we recognize the fact that there is a tremendous amount of emotional manipulation that a domestic violence offender places on his victim." Defendant objects to this statement on the ground that he and the victim had been living together since 2013 and there were no prior convictions against him. As an initial matter, we note that, although there may not have been prior convictions against defendant during this period for assaulting the present victim, defendant had pleaded guilty to domestic violence for assaulting his daughter in 2013, and for assaulting the victim's son in 2018. Further, we find nothing improper about the prosecutor's generic explanation to the jury about why no-contact orders are sometimes entered when domestic violence is at issue. In addition, the jury heard evidence that police had been called to defendant's and the victim's home several times since they had started living together and that the victim had, in fact, obtained a no-contact order against defendant. In light of

this evidence, we conclude that the prosecutor's brief explanation regarding the role of no-contact orders in domestic disputes was not improper.

Lastly, defendant challenges two of the prosecutor's statements as being improper appeals to the jury's sympathy. "A prosecutor may not appeal to the jury to sympathize with the victim." *People v Unger*, 278 Mich App 210, 237; 749 NW2d 272 (2008). Defendant first challenges the prosecutor's observation, "I think [the victim] had been the victim of manipulation for years." Given the entirety of the prosecution's argument, this statement appears to be an inference the prosecutor drew from the evidence presented at trial, yet a comment of the type the court had already instructed the jury to give no weight in its deliberations. Prior to closing arguments, the court had instructed the jury that the evidence in the case was complete, that it was comprised only of the witnesses' sworn testimony and the exhibits admitted into evidence, and that the statements and arguments of the attorneys were not evidence. Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors. *Unger*, 278 Mich App at 235. Defendant contends that these presumptions should not pertain here because defendant's trial was relatively brief and almost all of the prosecution's closing was improper. See *id*. at 237 (concluding that the trial court's instructions were curative because the prosecutor's improper statements were "relatively brief and likely did not deflect the jury's attention"). We conclude that even if the prosecutor's statement about what she thought may have been happening was improper, in light of the evidence admitted, the court's instructions, and our presumptions regarding the efficacy of the instructions and the diligence of the jury, we are not persuaded that the complained of statement was outcome determinative.

Next, defendant challenges the prosecutor's remark, "I cannot imagine the pressure that [the victim] feels when she leaves the court with defendant" and her comment that the jury could be certain another domestic violence incident would occur if defendant were to return home with the victim.[4] We agree that these comments were an attempt to evoke the jury's sympathy, but we do not deem them to be outcome determinative. The prosecutor did not urge the jury to suspend its duty to judge the evidence presented or urge the jury to convict defendant on the basis of its sympathy for the victim (or anticipated future conduct). See *People v Lane*, 308 Mich App 38, 66; 862 NW2d 446 (2014) (concluding that the prosecutor comments during closing argument were not improper because the prosecutor did not "urge the jury to suspend its powers of judgment" and find the defendant guilty on the basis of sympathy for the victim). Rather, the prosecutor went on to remark that while deliberating, the jury was to "[o]nly consider the evidence that you heard during the course of this trial." Further, the trial court instructed the jury not to let sympathy influence the verdict, and as previously mentioned, the jury is presumed to have followed its instruction. *Unger*, 278 Mich App at 235.

In sum, we find no reversible error associated with the prosecutor's closing argument. To the extent the prosecutor made any improper statements, they were not unduly prejudicial and did not affect defendant's substantial rights under a plain-error analysis. See *Carines*, 460 Mich at 763.

---

[4] Defendant and the victim remained together at the time of trial.

Defendant also argues that his trial counsel was ineffective for failing to object to the prosecutor's challenged statements. We disagree. Defendant preserved this issue for appellate review by filing in this Court a motion for remand to the trial court for a *Ginther* hearing.[5] Because we denied the motion,[6] our review is for errors apparent on the record. See *People v Foster*, 319 Mich App 365, 390; 901 NW2d 127 (2017) (citations omitted).

To prove he received ineffective assistance of counsel, a defendant must establish that "(1) the performance of his counsel was below an objective standard of reasonableness under prevailing professional norms and (2) a reasonable probability exists that, in the absence of counsel's unprofessional errors, the outcome of the proceedings would have been different." *People v Sabin (On Second Remand)*, 242 Mich App 656, 659; 620 NW2d 19 (2000). The effective assistance of counsel is presumed, and a defendant bears the burden to overcome the strong presumption that his counsel used sound trial strategy. *People v Rosa*, 322 Mich App 726, 741; 913 NW2d 392 (2018); see also *People v Jackson*, 313 Mich App 409, 431; 884 NW2d 297 (2015).

As discussed above, several of the prosecutor's statements defendant challenges were not improper. Thus, any objection would likely have been overruled. Counsel is not ineffective for failing to raise a futile argument. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel.") Also, as discussed above, the statements that were arguably improper were not prejudicial. Sufficient evidence was presented from which the jury could find defendant guilty beyond a reasonable doubt of domestic violence and of bribing, intimidating, or interfering with a witness. Additionally, the trial court instructed the jury not to let sympathy or prejudice influence its decision, to decide the case only on the basis of the properly admitted evidence, and that the lawyers' statements and arguments are not evidence. Therefore, even if defense counsel's failure to object constituted deficient performance, we cannot say that, but for this deficiency, there is a reasonable probability that the outcome of the trial would have been different. See *Sabin*, 242 Mich App at 659.

## III. CONSECUTIVE SENTENCING

Defendant contends the trial court erred by sentencing him to serve his sentences consecutively without articulating a rationale for its decision. We agree.

We review a trial court's decision to impose a discretionary consecutive sentence for an abuse of discretion. *People v Norfleet*, 317 Mich App 649, 663-664; 897 NW2d 195 (2016) (*Norfleet I*). An abuse of discretion occurs when the trial court's decision was outside of the range of reasonable and principled outcomes. *Id.* "The trial court's factual determinations regarding sentencing are reviewed for clear error." *People v Rodriguez*, 327 Mich App 573, 577; 935 NW2d 51 (2019). The trial court commits clear error when this Court is left with a definite and firm

---

[5] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[6] *People v Soring*, unpublished order of the Court of Appeals, entered January 29, 2020 (Docket No. 348870).

conviction that an error occurred. *People v Thompson*, 314 Mich App 703, 708; 887 NW2d 650 (2016).

MCL 750.122(11) authorizes consecutive sentencing for a conviction of bribing, intimidating, or interfering with a witness. MCL 750.122(11) provides that "[t]he court may order a term of imprisonment imposed for violating this section to be served consecutively to a term of imprisonment imposed for the commission of any other crime including any other violation of law arising out of the same transaction as the violation of this section." When imposing a discretionary consecutive sentence, the trial court must articulate its rationale for each consecutive sentence it imposes. *Norfleet I*, 317 Mich App at 664. The trial court may not provide mere "general terms" for consecutive sentences; rather, it must provide "particularized reasons—with reference to the specific offenses and the defendant." *Id*. at 666.

In the case at bar, the trial court had the statutory authority to sentence defendant consecutively for his domestic violence and bribing, intimidating, or interfering with a witness convictions under MCL 750.122(11). At sentencing, the trial court reviewed the presentence investigation report (PSIR), which recommended that defendant be sentenced to consecutive sentences of 3 to 20 years' imprisonment for domestic violence and 2 to 15 years' imprisonment for bribing, intimidating, or interfering with a witness. The trial court heard the parties' arguments for and against consecutive sentencing, defendant's statement, and the victim's statement, and explained:

> I think based upon the totality of everything I've seen here, the sentence that puts [defendant] in prison for two years is probably appropriate. And what I'm going to do is sentence [defendant] to one to 20, with credit for 110 on the assault, domestic violence, and a consecutive term of one to 15, with credit for 115 – 110 days on the witness intimidation, interference. When run together, would give [defendant] two years to whatever the maximum is. It's consecutive so it satisfies their requirement, but puts it down into a realm that I think is probably more appropriate for the offense than the totality of adding three and two together.

Although the minimum sentences as recommended in the PSIR would have been the same as or higher than defendant's ultimate sentence had the trial court selected and imposed them concurrently, the court failed to offer a particularized explanation for its decision to sentence defendant consecutively. Accordingly, remand is necessary for the trial court to explain on the record and with particularity its reasoning for sentencing defendant to serve his sentences consecutively.

We affirm defendant's convictions, but we remand for the trial court to articulate with particularity its rationale for imposing consecutive sentences. We also note that the judgment of sentence indicates defendant was convicted of domestic violence for knowingly assaulting a pregnant individual, third offense. However, defendant was not charged with knowingly assaulting a pregnant individual, MCL 750.81(3), no evidence was presented at trial that the victim was pregnant, and the verdict form did not indicate that the jury found defendant guilty of this

offense.[7]  Accordingly, we assume the judgment of sentence contains a mere clerical error when describing the nature of defendant's domestic violence conviction and instruct the trial court to make the necessary ministerial correction.  We retain jurisdiction.

/s/ Brock A. Swartzle
/s/ Jane M. Beckering
/s/ Elizabeth L. Gleicher

---

[7] The judgment of sentence lists PACC charging codes.  PACC 750.814 refers to "domestic violence and/or knowingly assaulting a pregnant individual, third offense notice" (capitalization omitted).  This is defendant's third conviction for domestic violence.

# Court of Appeals, State of Michigan

## ORDER

People of MI v Ronald Alvin Soring

Docket No. 348870

LC No. 18-002689-FH

Brock A. Swartzle
Presiding Judge

Jane M. Beckering

Elizabeth L. Gleicher
Judges

Pursuant to the opinion issued concurrently with this order, this case is REMANDED for further proceedings consistent with the opinion of this Court.

Proceedings on remand in this matter shall commence within 14 days of the Clerk's certification of this order, and they shall be given priority on remand until they are concluded. As stated in the accompanying opinion, we affirm defendant's convictions, but we remand for the trial court to articulate with particularity its rationale for imposing consecutive sentences, so as to allow for appellate review. *People v Norfleet*, 317 Mich App 649; 665; 897 NW2d 195 (2016). We retain jurisdiction so that, after being apprised of the trial court's rationale, we may review its decision for an abuse of discretion. *Id*. at 666. We also instruct the trial court to make the necessary ministerial correction to the judgment of sentence with respect to its description of the nature of defendant's domestic violence conviction. The proceedings on remand are limited to these issues, and no hearing with the parties is required at this point.

The parties shall promptly file with this Court a copy of all papers filed on remand. Within seven days after entry, appellant shall file with this Court copies of all orders entered on remand.

_____
Presiding Judge

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

December 10, 2020
Date

_____
Chief Clerk